In the Supreme Court of Georgia

Decided:  October 6, 2014

S14A0800.  RICKEY BROWN v. THE STATE.
S14A0801.  MECCO MCKINNEY v. THE STATE.

NAHMIAS, Justice.

Rickey Brown and Mecco McKinney appeal their convictions for murder and a firearm offense related to a gun fight between them and co-indictee Teon Richardson that resulted in the death of an innocent bystander, four-year-old Sedriana Rosser.  Finding no reversible error as to any of the many claims raised by one or both of the Appellants, we affirm in both cases.[1]

[1] The victim was killed on March 17, 2004.  On August 5, 2005, a Fulton County grand jury indicted Brown, McKinney, and Richardson for malice murder, two counts of felony murder (based on possession of a firearm by a convicted felon and aggravated assault), aggravated assault with a deadly weapon, possession of a firearm by a convicted felon, and possession of a firearm during the commission of a felony.  Brown and McKinney were tried together from May 2 to 15, 2006.  The jury found them both guilty of all the charges except malice murder, for which they were found guilty of the lesser included offense of voluntary manslaughter.  On June 30, 2006, the trial court entered an order sentencing both Brown and McKinney to serve life in prison for felony murder based on possession of a firearm by a convicted felon and five consecutive years for possession of a firearm during the commission of a felony.  The other guilty verdicts were vacated by operation of law or merged into the felony murder conviction.  Richardson was tried from June 26 to July 6, 2006, and was acquitted on all charges.  Brown filed a timely motion for new trial, which he then amended three times after being appointed new counsel.  McKinney, who is still represented by his trial counsel, filed a timely motion for new trial and then amended it twice.  After holding a hearing on both motions, the trial court denied them on July 11, 2013.  Brown and McKinney filed timely notices of appeal, and the two related cases were docketed in this Court for the April 2014 Term and submitted for decision on the briefs.

1. Viewed in the light most favorable to their verdicts, the evidence presented at trial showed the following. About three weeks before the shooting at issue here, Brown, McKinney, and Richardson got into a physical fight because Brown and McKinney believed Richardson had stolen something from them. Richardson also left a voice-mail on another person's phone threatening to kill Brown and McKinney with his TEC-9 gun. On March 17, 2004, Richardson was walking around the Jonesboro South apartment complex trying to sell a TEC-9, which he had attached to a string around his neck. When Brown and McKinney, who were giving two women a ride to the apartment complex, arrived in the parking lot, the three men spotted each other, drew their guns, and opened fire. Brown and McKinney got out of the car, and Richardson ran towards an occupied area of the complex and took cover in Cheryl Jackson's apartment. One of the shots struck and killed the victim child, who was outside playing. Brown and McKinney then drove away; when Richardson left Jackson's apartment, he was apprehended by Jonesboro South residents and held until the police arrived.

At Appellants' trial, eight eyewitnesses testified about the exchange between Brown, McKinney, and Richardson. The accounts varied considerably,

2

both from witness to witness and within some of the witnesses' testimony, regarding which of the three men had guns, who drew his gun first, and who actually fired his gun. Some of the testimony indicated that Brown and McKinney both had guns and both fired, and three of the witnesses testified that Brown and McKinney drew their guns first. The other five witnesses said that Richardson pointed his gun first, but only two of them believed that Richardson was actually able to shoot his gun. The police also found unfired bullets from a TEC-9 at the crime scene, which indicated that although he tried to shoot, Richardson's gun would not fire. Brown, McKinney, and Richardson did not testify. The jury was charged on self-defense justification, but rejected that defense and found Brown and McKinney guilty.

Neither Appellant challenges the legal sufficiency of the evidence. Nevertheless, in accordance with this Court's practice in murder cases, we have reviewed the record and conclude that the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find Brown and McKinney guilty beyond a reasonable doubt of the crimes for which they were convicted. See Jackson v. Virginia, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also Vega v. State, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("'It

was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" (citation omitted)).

2.      Before trial, McKinney filed a special demurrer to the indictment, arguing that it contained prejudicial surplusage in Counts 2, 6, and 7 and that its reference to his alleged alias was impermissible bad character evidence. The trial court denied the special demurrer, and we see no error in that ruling.

Count 2 of the indictment, which charged felony murder based on possession of a firearm by a convicted felon, alleged that McKinney, Brown, and Richardson caused the death of the victim "by engaging in a gun battle with each other which caused Sedriana Rosser to be shot and killed in the crossfire." Count 6, which charged felony murder based on aggravated assault, alleged that the victim was killed "in the crossfire." And Count 7, which charged aggravated assault, included another allegation that there was a "gun battle." McKinney contends that these allegations were prejudicial surplusage. However, "mere surplusage does not vitiate an otherwise valid indictment." Malloy v. State, 293 Ga. 350, 360 (744 SE2d 778) (2013). The language to which McKinney objects was permissible because the references to the "gun battle" and "crossfire"

4

"accurately described the offenses charged and made the charges more easily understood" by the defendants and the jury. Id.

The caption of the indictment referred to McKinney as "Mecco McKinney aka Jesse Chester," but during the trial, no witness identified McKinney by that alias, and there was no other evidence presented that he had used that name. Nevertheless, this Court explained long ago that while

> the appearance of an alias in an indictment might reflect unfavorably on the accused, it is the settled law of this State that the grand jury may so indict the accused, either when he is known by different names or when the grand jury is uncertain as to which of a number of names is his true name. The purpose of giving the name is to identify the accused. If this law is abused by an unjustifiable resort thereto by the grand jury, the accused has opportunity upon the trial to prove that he has never had an assumed name, and that he has never been known by the names given in the indictment aside from that which he admits is his true name.

Andrews v. State, 196 Ga. 84, 110-111 (26 SE2d 263) (1943), overruled in part on other grounds, Frady v. State, 212 Ga. 84 (90 SE2d 664) (1955). See also Allen v. State, 231 Ga. 17, 18 (200 SE2d 106) (1973).

A claim that the indictment has misidentified the defendant should be challenged by a special plea of misnomer, which will be sustained only when the defendant has never been known by *any* of the names listed in the indictment.

5

See OCGA § 17-7-112; Andrews, 196 Ga. at 110-111.  Moreover, there is no reason to believe that the mere mention of an innocuous-sounding alias in the caption of the indictment caused McKinney any harm.  Cf. Hawes v. State, 266 Ga. 731, 732-733 (470 SE2d 664) (1996) (holding that the inclusion of the alias "Stomper" in the indictment was proper where the defendant was known by that nickname, even though the victim "literally was beaten and stomped to death").

3.     McKinney also contends that the trial court erred in denying his pretrial motion to sever the count of the indictment charging possession of a firearm by a convicted felon (Count 10) and the related felony murder count (Count 2) for trial separately from the other charges, on the ground that evidence of his prior felony conviction for possession of cocaine was otherwise inadmissible as bad character evidence under former OCGA § 24-2-2.[2]  This Court has held that, in cases where a felon-in-possession firearm charge "is unrelated to another count for which the defendant is to be tried," the proceedings should be bifurcated so that the jury will hear and decide the more serious charge(s) before learning about the firearm charge and the defendant's

---

[2] Appellants' trial was held under Georgia's old Evidence Code.  Our new Evidence Code, effective for trials held after January 1, 2013, addresses character evidence in OCGA § 24-4-404 and the related provisions referenced therein.

prior conviction. Head v. State, 253 Ga. 429, 431-432 (322 SE2d 228) (1984), overruled on other grounds by Ross v. State, 279 Ga. 365 (614 SE2d 31) (2005). However, "a motion to bifurcate should be denied where the count charging possession of a firearm by a convicted felon might serve as the underlying felony supporting a felony murder conviction." Poole v. State, 291 Ga. 848, 850 (734 SE2d 1) (2012). See also Head, 253 Ga. at 432; Jones v. State, 265 Ga. 138, 139-140 (454 SE2d 482) (1995) (holding that bifurcation is not appropriate whenever there is a malice murder charge, because felony murder based on the felon-in-possession firearm charge could be a lesser included offense). Because in this case one of the counts of felony murder was based on the felon-in-possession firearm charge (and the indictment also charged malice murder), the trial court did not err when it denied McKinney's motion to bifurcate the trial.

4. Brown contends that the trial court erred during jury selection when it failed to grant his request to strike Juror 69 for cause. Juror 69 was a pediatrician who said during voir dire that "someone needed to pay" for what happened to the child victim, that she did not like guns, that it would be difficult for her to sit and listen to the evidence, and that she did not want to see the mother of the child cry. However, Juror 69 also testified that she would be

7

"willing to hear the facts" and confirmed that she had not presumed that Brown was guilty. She also said,

> I think I can be impartial, I mean, I deal with a lot of emotions in my position as a physician, and I can separate myself from these emotions and come to a logical decision. So I think I would be able to hear the evidence and come to a logical decision.

She added she "would do [her] best to set aside [her] emotions" and reiterated, "I think I can separate my emotions and look at the facts in the case." When the court asked if she could reach an impartial verdict, she answered: "I'm a human being with a lot of history, and I will do the best I can to be impartial. That's all I can say. I mean that's all I can really do."

"Whether to strike a juror for cause lies within the sound discretion of the trial judge, and the trial court's exercise of that discretion will not be set aside absent a manifest abuse of discretion. . . . The law presumes that potential jurors are impartial, and the burden of proving partiality is on the party seeking to have the juror disqualified." Poole v. State, 291 Ga. 848, 851 (2012) (citations omitted). Moreover,

> "[f]or a juror to be excused for cause, it must be shown that he or she holds an opinion of the guilt or innocence of the defendant that is so fixed and definite that the juror will be unable to set the opinion aside and decide the case based upon the evidence or the

8

court's charge upon the evidence. A prospective juror's doubt as to his or her own impartiality does not demand as a matter of law that he or she be excused. Nor is excusal required when a potential juror expresses reservation about his or her ability to put aside personal experiences. . . . A conclusion on an issue of bias is based on findings of demeanor and credibility which are peculiarly in the trial court's province, and those findings are to be given deference."

Brockman v. State, 292 Ga. 707, 721 (739 SE2d 332) (2013) (citation omitted).

Viewed under these principles, although Juror 69 indicated that she disliked guns and was upset that a child had been killed, the trial court did not abuse its discretion in concluding from the sum of her responses that she would be able to listen to the evidence and reach an impartial decision.

5. Before trial, Brown and McKinney gave notice, as required by Chandler v. State, 261 Ga. 402 (405 SE2d 669) (1991), and Uniform Superior Court Rule 31.6, of their intention to introduce evidence of Richardson's prior acts of violence in support of their justification defense. See Chandler, 261 Ga. at 407-408 ("[W]e will permit a defendant claiming justification to introduce evidence of specific acts of violence by the victim against third persons . . . ."). These acts included a 1994 incident for which Richardson pled guilty in Fulton County to two counts of simple battery for choking his mother; three separate incidents in Baltimore in 1998, where Richardson was allegedly involved in an

9

assault and battery, a carjacking and assault, and an assault; a 1999 incident for which Richardson was arrested in Taylor County, Georgia with a stolen CD player and a 9mm gun in his possession; and a 2004 incident for which Richardson was found guilty of choking someone. The trial court admitted the proffered evidence of only the 1994 and 2004 incidents.

Both Appellants challenge the trial court's refusal to let them call Richardson as a witness to testify about these incidents, based on his invocation of his privilege against self-incrimination. McKinney alone also now claims that the trial court should have granted Richardson immunity so that he would testify. And McKinney alone challenges the trial court's exclusion of the proffered evidence of the 1998 and 1999 incidents. We conclude that none of these enumerations of error have merit.

(a) When Appellants sought to call Richardson as a witness to testify about his previous acts of violence against other people, his counsel announced that Richardson would invoke his Fifth Amendment privilege against self-incrimination as to any questions about those prior acts, noting that Richardson's own trial was scheduled to begin in about a month. When a

10

witness expresses his intention to invoke his privilege against self-incrimination, the trial court must consider the questions that the witness would be asked and

> decide whether there is a real and appreciable danger that the answer[s] *could* incriminate the witness. If so, then the decision to answer must be left to the witness. If the trial court determines that the answers could not incriminate the witness, the witness is required to answer or face the court's sanctions.

Cody v. State, 278 Ga. 779, 780 (609 SE2d 320) (2004) (emphasis in original). After hearing arguments from both sides, the trial court here reasonably concluded that any questions as to Richardson's past violent acts could incriminate him and affect his pending trial. Accordingly, the court precluded Appellants from calling Richardson as a witness.

Citing Spivey v. State, 200 Ga. App. 284 (407 SE2d 425) (1991), Appellants argue that the trial court erred in refusing to let them call Richardson to the witness stand outside of the presence of the jury and then considering on a question-by-question basis whether Richardson had a legitimate reason to invoke his privilege against self-incrimination.[3] However, Appellants did not identify at trial, and still have not identified on appeal, any specific questions

_____

[3] It is clear that the trial court acted within its discretion in refusing to make Richardson take the witness stand and invoke his right against self-incrimination in front of the jury. See Davis v. State, 255 Ga. 598, 604 (340 SE2d 869) (1986).

about the prior violent acts as to which Richardson could not validly assert his privilege. This is not a case like Spivey, where the limited questioning proposed by the defendant appeared calculated "to elicit only potentially relevant testimony exculpatory of [the defendant], rather than incriminatory of [the witness]." See id. at 285.

(b)     McKinney also claims that the trial court should have granted Richardson use immunity under former OCGA § 24-9-28 to compel his testimony about the prior incidents.[4] However, McKinney did not ask the court to do this during the trial and thus did not preserve this claim for review on appeal. See Rucker v. State, 291 Ga. 134, 138 (728 SE2d 205) (2012).

---

[4] Former OCGA § 24-9-28 (a) said, with emphasis added:

Whenever *in the judgment of the Attorney General or any district attorney* the testimony of any person or the production of evidence of any kind by any person in any criminal proceeding before a court or grand jury is necessary to the public interest, *the Attorney General or the district attorney may request* the superior court in writing to order that person to testify or produce the evidence. Upon order of the court that person shall not be excused on the basis of his privilege against self-incrimination from testifying or producing any evidence required; but no testimony or other evidence required under the order or any information directly or indirectly derived from such testimony or evidence may be used against the person in any proceedings or prosecution for a crime or offense concerning which he testified or produced evidence under court order. . . .

This provision is found in the new Evidence Code at OCGA § 24-5-507 (a).

In any event, "[t]his Court has never directly held that a defendant, as opposed to the State, may properly request a trial court to extend use immunity to a defense witness." Ward v. State, 292 Ga. 637, 639 (740 SE2d 112) (2013). We explained long ago that "[o]ur statutes provide no such discretion to the court and, further, make no provision for a grant of immunity to defense witnesses." Dampier v. State, 249 Ga. 299, 300 (290 SE2d 431) (1982). In Dampier, we noted that the United States Court of Appeals for the Third Circuit had adopted a test for "judicially imposed use immunity," but concluded that Dampier's claim failed even under that test because the State's interest in denying immunity to the witness outweighed the defendant's need for the testimony. See id. at 301-302. The Third Circuit has recently changed course and brought its law in line with every other federal circuit court in holding that courts do not have the authority to grant immunity to a witness at the request of a defendant, because "Congress has given the Executive Branch the sole authority to immunize witnesses." United States v. Quinn, 728 F3d 243, 252 (3d Cir. 2013). We now squarely hold that Georgia law does not authorize a trial court to grant use immunity to a witness at the request of a defendant. See

13

Dennard v. State, 313 Ga. App. 419, 421 (721 SE2d 610) (2011) (adopting the same holding).

McKinney also now suggests that the trial court could have excluded Richardson's testimony at Appellants' trial from being used later in Richardson's trial. However, McKinney does not cite any precedent authorizing one defendant to seek an order suppressing evidence in another defendant's trial, and again he did not explicitly seek such an order from the trial court. See Quinn, 728 F3d at 254-255 (explaining that the United States Supreme Court has limited the trial court's ability to prevent a defendant's testimony in a pretrial hearing from being used against him at his later trial to cases where "the defendant witness faced a conflict between two [of his own] constitutional rights").

(c) To prove the three separate incidents of violence allegedly committed by Richardson in Baltimore in 1998, Appellants proffered only the police reports of each incident. Appellants acknowledged that the reports were hearsay but maintained that the reports should be admitted under the necessity exception to the hearsay rule because, given Richardson's refusal to testify at trial, the reports were the only evidence of his alleged violent acts in 1998. See

former OCGA § 24-3-1 (b).[5] The trial court ruled that the police reports were inadmissible, and McKinney enumerates that ruling as error.

"In order to admit a statement under the necessity exception to the hearsay rule, the declarant must be unavailable, there must be particular guarantees of trustworthiness, and the statement must be shown to be relevant to a material fact and more probative of that material fact than other evidence that might be procured and offered." White v. State, 276 Ga. 583, 586-587 (2003). Even assuming that the authors of the three 1998 police reports and the victims and witnesses whose statements were recounted in two of the reports were all outside Georgia and thus deemed unavailable, see Bragg v. State, 279 Ga. 156, 157 (611 SE2d 17) (2005), and that the reports were relevant as the only evidence of these alleged prior acts of violence by Richardson, Appellants failed to establish the necessary guarantees of trustworthiness.

The report of the first 1998 incident identified the perpetrator as a black male named "Tion Chauncy Richardson" and included the perpetrator's date of birth and address. The report of the second incident identified the perpetrator only as "Teon," describing him as a black male with three gold teeth. The report

---

[5] The necessity exception is codified in the new Evidence Code at OCGA § 24-8-807.

of the third incident identified the perpetrator as "Teon C. Richardson" and included the same address and date of birth as the first report. Other than the relatively common name, Appellants offered no evidence directly linking the Teon Richardson involved in this case with the alleged perpetrator (or perpetrators) described in the police reports from Baltimore – not even evidence of Richardson's birthdate or that he was living in Baltimore in 1998. We note that the police report from the 1999 Taylor County incident includes a birthdate for Richardson that matches the date on the two 1998 police reports – but the police report from the 1994 incident in Fulton County, which was admitted along with the testimony of the investigating officer, lists a *different* birthdate for Richardson. Nor did Appellants offer any evidence of charges or convictions relating to the Baltimore incidents. The trial court found that there was no reliable evidence that Richardson was the person identified in the 1998 police reports, and we cannot say that the court's finding was clearly erroneous.

In addition, the only information about violent acts contained in the police reports of the first two incidents was double hearsay – the statements of victims and witnesses recounted in those reports. At trial, McKinney asserted that this double hearsay issue could be eliminated through redaction of those statements

16

from the police reports, but if the victim and witness statements were redacted, the reports would include no description of the perpetrator's violent acts and thus would be irrelevant. And on appeal, McKinney does not suggest a theory by which the victim and witness statements would have been admissible, and we need not search for one sua sponte.

As for the police report of the third 1998 incident, which contains an officer's account of the perpetrator's violence toward him, this Court has expressed doubts about the reliability of such narrative portions of police reports when offered in criminal trials. See, e.g., Brown v. State, 274 Ga. 31, 33-36 (549 SE2d 107) (2001) (explaining that the narrative portion of a police report "does not have the reliability inherent in other documents that courts have traditionally considered to be business records," and concluding that "the narratives contained in police reports generated in connection with police investigations are not the appropriate subject of an exception to the hearsay rule."). Moreover, the trial court admitted evidence of the 1994 and 2004 incidents of violence committed by Richardson, making the evidence of the 1998 incidents somewhat cumulative. Under these circumstances, the trial court did not abuse its discretion in excluding the three 1998 police reports.

17

(d)    The trial court also excluded the proffered evidence that in 1999 in Taylor County, Richardson broke into a car and was arrested as he fled with a stolen CD player and a 9mm gun in his possession, on the ground that the incident did not involve an act of violence.  McKinney challenges this ruling, but we again see no abuse of discretion.

The burden is on the defendant to show that the alleged victim's prior acts involved violence toward a third party.  See Bennett v. State, 265 Ga. 38, 41 (453 SE2d 458) (1995).  This Court has held that merely possessing a firearm – even an illegal sawed-off shotgun – is not a "specific act of violence" against a third party, without proof of a specific victim.  Smith v. State, 270 Ga. 240, 243-244 (510 SE2d 1) (1998), overruled on other grounds by O'Kelley v. State, 284 Ga. 758 (670 SE2d 388) (2008).  And McKinney's assertion that the evidence related to the 1999 incident proved that Richardson pointed the gun at a police officer is not supported by that evidence, in particular the transcript from the hearing at which Richardson entered his guilty pleas for offenses related to that incident.  The transcript shows that, in response to the prosecutor's allegation that he pulled out a pistol and started to point it at the officer, Richardson denied pulling a gun on the officer and explained, "I'm

18

pretty sure if I pulled out a pistol and pointed at him he would have shot me";
the judge taking the plea agreed with Richardson. Accordingly, the trial court
properly excluded evidence of the 1999 incident.

6. Toney Carter, a resident of the apartment complex where the
shooting occurred, was called as a witness by the State. Based on statements he
made during his direct examination, he was questioned by both parties outside
the presence of the jury, and he said that earlier on the day of the shooting,
Richardson had openly bragged about pulling a gun on Brown and Brown's
child that morning. During this convoluted and conflicting testimony, Carter
claimed both that he heard about Richardson's boast only from "reliable people"
and that he personally heard the boast. The trial court ruled that Carter's
proffered testimony about Richardson's alleged statement was inadmissible as
hearsay.

Both Appellants now contend that Carter's testimony should have been
admitted as non-hearsay to show Richardson's state of mind on the day of the
shooting. The validity of this theory depends on which parts of Carter's
inconsistent testimony are considered. To the extent that Carter said that he
heard about Richardson's boast only from "reliable people," the statements

made to Carter by those unidentified people are themselves hearsay and were properly excluded. The parts of Carter's testimony that indicate that he heard Richardson's boast directly, however, might be admissible to prove Richardson's state of mind, because even if Richardson was lying about making the threat, the fact that he *said* to Carter that he had threatened Brown indicated his ill-will toward Brown. See Sturkey v. State, 271 Ga. 572, 573 (522 SE2d 463) (1999).

At trial, however, Appellants argued only that Carter's testimony about Richardson's statement was admissible under the exception to the hearsay rule for a statement made by a party, an argument they have abandoned on appeal. Appellants did not argue at trial that any part of Carter's testimony was non-hearsay, and thus they did not preserve that claim for review on appeal. See Rucker, 291 Ga. at 138. In any event, any error the trial court may have made in excluding part of Carter's proffered testimony that Richardson posed a threat to Brown was harmless, given the testimony of five eyewitnesses that Richardson pointed his TEC-9 gun at Brown and McKinney before they drew their guns.

7. McKinney alone contends that the trial court erred in excluding Cheryl Jackson's hearsay statement that Richardson entered her apartment after the shootout with McKinney and Brown and then dislodged the clip of the gun he was carrying, wiped the clip off with a shirt, reloaded the clip, and cocked the weapon. Jackson recounted these events in a signed statement to the police, but she died before Appellants' trial. The trial court denied McKinney's pretrial motion to admit Jackson's statement under the necessity exception to the hearsay rule on the ground that McKinney had not shown that her statement was more probative of a material fact than other available evidence, see White, 276 Ga. at 586-587, because other witnesses were available to testify that Richardson had a gun and that he entered Jackson's apartment during the shootout.

McKinney asserts, however, that Jackson's statement was the only evidence that could establish that Richadson's gun was actually capable of firing. But two eyewitnesses testified that they believed Richardson actually fired shots, and Jackson's statement does not prove that Richardson's gun was capable of firing, since she never said that she saw the gun fire. Indeed, the events she recounted would support the inference that Richardson's gun had

jammed and needed to be cleared before it would be capable of firing, an inference supported by direct testimony from other eyewitnesses that the gun did not fire. Under these circumstances, the trial court did not abuse its discretion in denying McKinney's motion to admit Jackson's hearsay statement under the necessity exception.

8.     At trial, the State introduced evidence, in the form of testimony from Brown's ex-girlfriend and an officer who investigated the incident, showing that in May 1999, Brown was standing on his ex-girlfriend's porch with her, her daughter, and other children when he was approached by her new boyfriend and another man. Brown responded by pulling out a handgun, pointing it at the people on the porch, and pulling the trigger, although the gun did not fire. This evidence was admitted to show Brown's course of conduct and bent of mind, and the court gave a limiting instruction to that effect. Brown argues that the admission of this evidence was error. We disagree.

Before a trial court can admit similar transaction evidence, the State must show that:

> "(1) it seeks to introduce the evidence not to raise an improper inference as to the accused's character, but for some appropriate purpose which has been deemed to be an exception to the general

rule of inadmissibility; (2) there is sufficient evidence to establish that the accused committed the independent offense or act; and (3) there is a sufficient connection or similarity between the independent offense or act and the crime charged so that proof of the former tends to prove the latter."

Hanes v. State, 294 Ga. 521, 522 (755 SE2d 151) (2014) (citation omitted). At the time of Appellants' trial, it was appropriate for the State to introduce evidence of a defendant's prior bad acts for the purpose of showing his "course of conduct" and "bent of mind." See, e.g., Cockrell v. State, 281 Ga. 536, 539-540 (640 SE2d 262) (2007).[6] And the evidence the State presented was clearly sufficient to establish that Brown committed the act in May 1999.

Brown maintains, however, that the 1999 incident was not sufficiently similar to the shooting at issue in this case. The proper focus is on the similarities, not the differences, between the crimes charged and the prior acts. See Brite v. State, 278 Ga. 893, 894-895 (608 SE2d 204) (2005). In both incidents, Brown pulled out a handgun and aimed it at a person with whom he had a dispute, in a residential area, ignoring the presence of innocent bystanders, including a child. Thus, the trial court did not abuse its discretion in concluding that the incidents were sufficiently similar and admitting the evidence of the

_____

[6] Under the new Evidence Code, the admission of this type of evidence is governed by OCGA § 24-4-404 (b).

1999 act. See id. (holding that the trial court did not err in admitting similar transaction evidence because the prior incident and the incident at issue shared several similarities, including showing the defendant's "propensity to resort to deadly force with little or no provocation"); Hickson v. State, 308 Ga. App. 50, 52-53 (706 SE2d 670) (2011) (concluding that the three prior incidents and the incident at issue were sufficiently similar because they all involved the defendant's pulling out a gun after a verbal altercation).

Judgments in Case No. S14A0800 and Case No. S14A0801 affirmed. All the Justices concur.